STATE, RESPONDENT, *v.* REES, APPELLANT.

(No. 2,777.)

(Submitted February 24, 1910. Decided March 5, 1910.)

[107 Pac. 893.]

*Criminal Law—Homicide—Information—Causing Death by Ex-
posure—Sufficiency—Election—Hearsay    Evidence—Instruc-
tions—Curing Error.*

Homicide—Exposure—Information—Sufficiency—Election.
   1.  The only offense charged in an information alleging that accused
   assaulted deceased, violently threw her to the ground, and otherwise
   assaulted her until she became unconscious and then permitted her
   to lie exposed to inclement weather, and neglected and refused to
   provide her with necessary clothing and protection, by reason of
   which assault and exposure she died, was murder, so that the state
   was not bound to elect whether it would proceed on the theory of
   assault, or exposure, or both. If any of the charge was sur-
   plusage, defendant was not prejudiced thereby.

Same—Causing Death by Exposure—Husband and Wife—Evidence—
   Admissibility.
   2.  If defendant, after assaulting deceased, left her exposed to
   the inclemency of the weather with malice aforethought, and she
   died from such exposure, he was guilty of murder, whether she was
   his wife or not; therefore the admission in evidence of testimony

that deceased was defendant's wife, a fact not alleged in the information, was not prejudicial error; but, if error, it was cured by an instruction that the state having failed to show any violation of duty toward deceased, conviction could not be had on that ground.

Same—Hearsay Testimony—Inadmissibility.

3. A witness testified that deceased told her that accused had said that a neighbor told him that a certain man was seen about the house, that accused said that he was very jealous of her anyway, and abused her because she would not admit that the man was there; that deceased told her that accused was cruel and angry toward her when he was intoxicated, and asked witness whether she would shelter her on such occasions, and also told witness that accused had threatened to kill her several times, that he would beat her cruelly, and that she was afraid he would kill her. *Held,* that the testimony was hearsay and incompetent.

Same—Hearsay Testimony—Erroneous Admission—Curative Instructions—When Ineffective.

4. Defendant was convicted of murder in the second degree. The only direct evidence showing malice consisted of the hearsay statements referred to in paragraph 3, *supra,* and of testimony as to threats made over a year before the killing. But for the former statements, the jury might have disbelieved the latter and concluded that the crime was committed in the heat of passion or while defendant was so intoxicated that he was unable to form a criminal intent. *Held,* that under these circumstances a mandatory, clear and explicit instruction to the jury to disregard the hearsay testimony did not cure the error in admitting it in the first instance, but that its effect upon the minds of the jury could not have been other than to arouse their passions and prejudices which the instruction was unable to eradicate.

*Appeal from District Court, Lewis and Clark County; J. M. Clements, Judge.*

WILLIAM REES was convicted of second degree murder, and from the judgment and an order denying him a new trial he appeals. Reversed and remanded.

*Messrs. Clayberg & Horsky,* and *Mr. H. L. Clayberg* submitted a brief in behalf of Appellant. *Mr. John B. Clayberg* argued the cause orally.

We find no allegation in this information that there existed any duty on the part of defendant to care for or protect the deceased from the inclemency of the weather, nor any allegation of any relationship between defendant and deceased from which such duty would arise under the law. If no duty is alleged, no proof could have been introduced showing its violation, and therefore no criminal negligence for the neglect to perform such

duty. It thus appears clear that the court erred in permitting the state to show the relationship of husband and wife between the defendant and the deceased, or to show any facts from which the jury could have found that defendant violated a duty charged upon him by law because of this relationship, in not protecting and caring for his wife. (See *Regina* v. *Conde*, 10 Cox C. C. 547; *Regina* v. *Rugg*, 12 Cox C. C. 16; *Regina* v. *Nickolls*, 13 Cox C. C. 75; *United States* v. *Knowles*, 5 Saw. 517, Fed. Cas. No. 15,540; *People* v. *Beardsley*, 150 Mich. 206, 121 Am. St. Rep. 617, 113 N. W. 1128, 13 L. R. A., n. s., 1020; *Johnson* v. *State*, 66 Ohio St. 59, 90 Am. St. Rep. 564, 63 N. E. 607, 61 L. R. A. 277; *State* v. *Noakes*, 70 Vt. 247, 40 Atl. 249; *Hendrickson* v. *Commonwealth*, 85 Ky. 281, 7 Am. St. Rep. 596, 3 S. W. 166; *State* v. *Preslar*, 3 Jones, 421; 21 Cyc. 770.)

The rule in criminal cases is, that if the incompetent testimony *may have prejudiced* the jury, the error in its admission cannot be cured, even if the evidence is stricken from the record and the jury is instructed not to consider it. (*Barth* v. *State*, 39 Tex. Cr. 381, 73 Am. St. Rep. 935, 46 S. W. 228; *Bullock* v. *State*, 65 N. J. L. 557, 86 Am. St. Rep. 668, 47 Atl. 62; *Drury* v. *Territory*, 9 Okl. 398, 60 Pac. 101; *State* v. *Finch*, 71 Kan. 793, 81 Pac. 494; *Henard* v. *State*, 46 Tex. Cr. 90, 79 S. W. 810; *Dysart* v. *State*, 46 Tex. Cr. 52, 79 S. W. 534; *People* v. *Roderiguez*, 134 Cal. 140, 66 Pac. 174; *State* v. *Bateman*, 198 Mo. 212, 94 S. W. 843; *State* v. *DeMasters*, 15 S. D. 581, 90 N. W. 852; *State* v. *Sprague*, 64 N. J. L. 419, 45 Atl. 788; *Durham* v. *State*, 45 Tex. Cr. 475, 76 S. W. 563; *State* v. *Meader*, 54 Vt. 126; *Flowers* v. *State*, 85 Miss. 591, 37 South. 814; *Davis* v. *State*, 85 Miss. 416, 37 South. 1018.) The same rule is announced in civil cases. (*Howe Machine Co.* v. *Rosine*, 87 Ill. 105; *Maxted* v. *Fowler*, 94 Mich. 106, 53 N. W. 921; *Erben* v. *Lorillard*, 19 N. Y. 299; *Randall* v. *N. W. Tel. Co.*, 54 Wis. 140, 41 Am. Rep. 17, 11 N. W. 419; *Throckmorton* v. *Holt*, 180 U. S. 552, 21 Sup. Ct. 474, 45 L. Ed. 663; *Kneeland* v. *Great Western Elev. Co.*, 9 N. D. 49, 81 N. W. 67; *Boydan* v. *Haberstumpf*, 129 Mich. 137, 88 N. W. 386; *Gattis* v. *Kilgo*, 131 N. C. 199, 42 S. E. 584;

*Illinois Central Ry. Co.* v. *Ely,* 83 Miss. 519, 35 South. 873; *Norton* v. *Perkins,* 67 Vt. 203, 31 Atl. 148.) The reason for the rule must be much stronger when applied to criminal cases, especially those where defendant's life or liberty is involved. The constitutional provisions as to a fair and impartial trial apply to criminal cases, and the rules of evidence are much stronger than in civil cases.

There was a brief in behalf of the State by *Mr. Albert J. Galen,* Attorney General, and *Mr. William L. Murphy,* Assistant Attorney General, and oral argument by the latter.

If a person make an unjustifiable assault upon another, which renders the other unconscious and helpless, and then leaves the victim exposed in such condition to the rigors of a December night in this climate, and death results from the combined assault and exposure, an information charging the assault, as well as the exposure, recites the facts which constitute the cause of death, and especially is this true in this present instance. The case of *Territory* v. *Manton,* 7 Mont. 162, 14 Pac. 637, disposes of the construction of appellant. It makes no difference under the information filed in the present case whether deceased was the wife or other relative of defendant, or whether he owed her any special duty to protect and shelter, on account of the fact that the information clearly and specifically sets up that the exposure in the helpless and unconscious condition was brought about by the acts of the defendant himself.

The jury was instructed that all the evidence of the witnesses with reference to the statements claimed to have been made to them by the deceased relative to the actions, conduct or threats of the defendant, should be wholly disregarded. Thus the error in admitting the testimony in the first instance was cured. (See *State* v. *Rhys* (Mont.), 105 Pac. 494.)

MR. JUSTICE SMITH delivered the opinion of the court.

The charging part of the information in this case is thus summarized by defendants' counsel in their brief: "That he beat,

bruised, and assaulted Sarah Rees, violently threw her to the
ground, pulled her around by the hair of her head and other-
wise committed grievous assaults upon her person, until she be-
came unconscious; that he then permitted her to lie on the
ground exposed to the frost and inclemency of the weather, and
neglected and refused to provide her with necessary clothing,.
shelter, and protection, by reason of which assault and exposure
Sarah Rees died.'' ˙

1. We think the court was correct in declining to compel the
state to elect whether it would proceed on the theory of assault
alone, or exposure alone, or both assault and exposure. The
statute commands (section 9147, Revised Codes) that the infor-
mation must contain a statement of the facts constituting the
offense, in ordinary and concise language, and in such manner
as to enable a person of common understanding to know what is.
intended. We think the pleader succeeded admirably in follow-
ing the injunction of the statute. If any of the charge was.
surplusage, the defendant was not prejudiced. It would be al-
together too technical a ruling to hold that the state must elect
in such case. There is but one charge in the information—that
of murder.

2. The court permitted witnesses to testify that Sarah Rees
was the wife of defendant. There is no such allegation in the
information, and it is now insisted that this ruling was erroneous,
because no duty to protect, care for, or shelter her devolved upon
him unless such relation existed. It is impossible to suppose
that the cause could have been tried without the fact being dis-
closed; but however that may be, we are of opinion that even if
deceased was not defendant's wife, if he was guilty of the assault,
the legal duty rested upon him to protect, care for, and shelter
her after that act to the same extent as though she had been
his wife. This court in *Territory* v. *Manton*, 7 Mont. 162, 14
Pac. 637, said: ''If the defendant had, by his own acts, sub-
jected her to the inclemency of the weather, there would be no·
doubt but that he would be guilty of murder if she had died from
the exposure, and he had so subjected her unlawfully and with.

malice aforethought." The court then proceeded to hold that, the deceased being the wife of the accused, he was guilty of murder "when he absolutely did nothing" after having simply discovered her "exposed to the unpropitious elements." We think the information is good. Moreover, the defendant was not prejudiced by the ruling, for the reason that the court afterward told the jury that the state had failed to show any violation of duty on his part or that the death of Sarah Rees was caused by any omission of duty by him, and therefore they could not convict him on the ground of violation of, or failure to perform, any duty.

3. It is contended that the testimony is insufficient to justify the verdict. It would serve no useful purpose to quote it all, or any considerable portion of it. It tended to show that both the defendant and deceased were addicted to the use of intoxicants, frequently to excess; that on the evening of December 4, 1907, they returned to their ranch in the northern part of Lewis and Clark county, from the town of Wolf Creek, with a considerable quantity of whisky. Both had been drinking before their arrival. They continued to drink and carouse until the morning of December 6th, when the defendant appeared at the house of one of his neighbors with the information that his wife was dead. He was in a weakened condition, from excessive drinking, at the time, and continued to be ill and weak until the arrival of the coroner, on the second day thereafter. He informed the neighbors without hesitation of the details of the orgy at his house, and appeared greatly affected by the death of his wife. None of his actions, after discovery of the body, tended, so far as we can gather from the testimony, to discredit his version of what had occurred. Mrs. Rees was found lying upon the bed, with her body literally covered with wounds. Her hair was disheveled, matted with grass and dirt, and her clothing torn. The house was in great disorder. A broken breadboard was found in the yard. The evidence was entirely circumstantial. Apparently the theory of the state was, that the defendant had beaten the deceased with the breadboard, had violently thrown

her to the ground, had kicked her, pulled her about by the hair of her head, until she became unconscious and then left her in this condition, lying upon the frozen ground, from 5 o'clock in the afternoon until after 9 o'clock in the evening, when he carried her into the house, laid her on the floor for a few hours, and afterward placed her upon the bed. Defendant's story was that she was in a drunken, maudlin, and almost helpless condition from the morning of December 5 until her death; that she fell repeatedly upon sharp rocks about the yard, and from the front steps of the house, and finally, late in the afternoon, passed from his sight (he was lying upon the bed helplessly drunk), to a spot about thirty-three feet from the house, where at 9 o'clock at night he discovered her upon the ground; that he succeeded, after much effort and resistance on her part, in getting her into the house, but was unable to get her upon the bed. About 2 o'clock in the morning she became conscious, spoke about a bottle of liquor in her trunk, and asked for water. He gave her the water, placed her upon the bed and went to sleep by her side. About 5 o'clock he awoke to find her dead. The state contended that some of the wounds upon her body could not have been caused by falling as described by the defendant. Medical testimony was received to the effect that they might have been. Four witnesses testified that in passing the house in the fall of 1906, they heard Rees say, apparently to his wife, "You'll get the damn'dest beating you ever got." We think the testimony, while it tends more strongly to prove the crime of manslaughter than that of murder, was still sufficient to warrant the jury in finding the defendant guilty of murder in the second degree, which they did. If they disbelieved the testimony of the defendant, they may have been of opinion that the circumstances attending the killing showed an abandoned and malignant heart.

4. Several witnesses testified for the defendant that he and his wife appeared to be a happy couple and were apparently very fond of each other.

Mrs. Frank Reinig was allowed, over defendant's objection, to answer the following question: "Do you know the treatment

he [defendant] accorded his wife?" The answer was, in substance, that Mrs. Rees had told her that Rees had said that a neighbor had told him that a certain man had been seen about her house, and "that he was very jealous of her anyway"; that he became very angry with her, and "had abused her because she wouldn't say that this man had been there."

Mrs. W. A. Reinig was asked the following question: "Did you have any conversation with Mrs. Rees prior to her death, shortly prior to her death, in which she asked you if it would be agreeable to you for her to come to your house in case she felt that it was necessary to get away from Mr. Rees? A. Yes, sir. Q. Now state what that conversation was. A. (Over objection.) Why, she was telling me about Mr. Rees, about his being so cruel and angry to her when he was under the influence of liquor, and she asked me if Mr. Rees should get so angry and cruel to her, whether I would shelter her, and I said, 'Yes.' Q. You may state anything further with reference to the conversation that you had with Mrs. Rees, if there is anything, which you now recall. A. When Mr. Rees took his last load of grain she told me that she wished that load of grain was at Wolf Creek already; she said she was afraid Mr. Rees would get drunk again. She said, 'Don't tell your husband, because if Mr. Rees knew he would be angry with me.'"

The witness Lola Estill testified, over objection: "I wanted to feed the cat, and she said she was afraid of Will, and I asked her why, and she said that he had threatened to kill her several times. * * * She said that he would beat her cruelly. Q. [On cross-examination.] Well, did she just say those four sentences at one time, or were they said at different times? Did she say: 'You shouldn't feed the cat; I am afraid of Will; he has threatened to kill me several times; he will beat me cruelly?' A. No, sir; she didn't say that all at once. Q. Well, now, let us have what was said by you in between times. A. Well, I asked her why, she said, 'Because Will threatened to kill her several times.' Q. Now, when she got through saying that, did she then go ahead? What was it she was afraid of? A. She

said she was afraid of Will before she said she was afraid he would kill her. Then she continued after that and said, 'He has threatened to kill me several times, and he will beat me cruelly.' Those were the two reasons she gave for not feeding the cat. She stated, first, that she was afraid of him; second, that he had threatened to kill her several times; and, last, that he would beat her cruelly, and then that she was afraid of him.''

Mrs. Sam Besette was asked on cross-examination: ''What was she [Mrs. Rees] doing in the kitchen? A. I went back in the kitchen and talked to her, she told me she was afraid of him. Defendant's Counsel: Never mind what she told you. We move to strike it out. Court: I can't strike it out after you called for it. Q. (On redirect examination.) What else did she tell you? A. (Over objection.) She told me she was afraid of that man; she says, 'It is so disagreeable to live with him.' She told me that she was afraid because he was very disagreeable and quick tempered. I asked her if she cared to come and stay with me. She refused, and said she thought it was her duty to, stay with him. She says the same morning he went with a glass of liquor and tried to give her some. Well, she took a little to please him, and afterward he went with a glass full and throwed it in her face because she refused and wouldn't drink.''

This testimony was hearsay and clearly incompetent. Indeed, the trial court recognized it as such when, near the close of the trial, the judge said to counsel for the state: ''I was going to say that I am inclined to the view that all of this testimony as to the threats of the defendant, and all the testimony showing fear on the part of the deceased should be stricken out of the record and disregarded by the jury entirely, unless you can satisfy me that it is competent. I will instruct the jury on that point unless you can do so.'' The testimony was not stricken, but the court by appropriate instruction withdrew it from the consideration of the jury and instructed them to clear their minds of it and not consider it in any way in arriving at a verdict.

The defense claims that the action of the court in directing the jury to disregard the testimony did not cure the error and could not have resulted in eliminating the prejudicial effect of the testimony; while the attorney general maintains that the error was cured by the instruction given. No rigid rule may be adopted that will apply to all cases of this nature. Each case must be decided upon its own record. This court recognizes the fact that all causes cannot be tried in a technically correct manner. Many questions of law arise during the course of a trial which the trial judge has not the time or opportunity to thoroughly investigate before ruling. He must proceed as expeditiously as possible. It is often the case that the question presented is very close and difficult of solution, without precedent for guidance in ruling, or, more often, having precedent in numerous and respectable authority, for a ruling either way. In such case the judge must rule in accordance with his own judgment. Should he subsequently determine that he has ruled erroneously, it is his duty to correct the effect of the ruling, if possible. Often this may be done in such manner as to remove the prejudice created by the evidence admitted. The judge who tried this case made every effort to counteract the effect of the incompetent testimony. His charge upon the point was clear, explicit, and mandatory. It is for this court to decide whether it clearly had the desired effect. The supreme court of Oklahoma, in the case of *Drury* v. *Territory,* 9 Okl. 398, 60 Pac. 101, said: ''It is a generally accepted doctrine that error in admitting illegal evidence may be cured by instructing the jury to disregard it; but whether such instruction does in fact cure the error is a question that should be determined from the character of the illegal evidence, the extent of it, and its probable effect upon the jury. The doctrine has been announced that where incompetent evidence is admitted, and afterward withdrawn by the court and the jury instructed to disregard it, the error of admitting it cannot be complained of. On the other hand, a number of courts hold that when illegal or incompetent evidence of a prejudicial character has gone before the jury,

the injury is too deeply fixed in their minds to be eradicated, and the error cannot be cured by any instruction of the court. Neither of the two extremes is consistent with sound reason and good practice. To say that a juror is never prejudiced, and his verdict never affected, by illegal or incompetent evidence is in conflict with human experience and judicial observation; while to say that the jury are in every case prejudiced by such evidence, even though directed to disregard it, is to place entirely too low an estimate upon the intelligence of the jurors and establish a rule of practice which makes it practically impossible for a court to try a criminal case without committing reversible error. In cases where improper prejudicial evidence has been permitted to go to the jury upon a wrong theory, or under a mistake of the court as to the law, * * * and the evidence thus introduced is of a character to prejudice the jurors against the defendant, and to make a fixed impression upon the mind, and it is not reasonably probable that the verdict would have been the same had this illegal evidence not been introduced, we think a new trial should be granted." (See, also, *Barth* v. *State,* 39 Tex. Cr. Rep. 381, 73 Am. St. Rep. 935, 46 S. W. 228; *Bullock* v. *State,* 65 N. J. L. 557, 86 Am. St. Rep. 668, 47 Atl. 62; *State* v. *Finch,* 71 Kan. 793, 81 Pac. 494; *Dysart* v. *State,* 46 Tex. Cr. Rep. 52, 79 S. W. 534; *People* v. *Rodriguez,* 134 Cal. 140, 66 Pac. 174; *Davis* v. *State,* 85 Miss. 416, 37 South. 1018; *State* v. *Bateman,* 198 Mo. 212, 94 S. W. 843; *State* v. *De Masters,* 15 S. D. 581, 90 N. W. 852.)

In this case we have only to determine, if the testimony was incompetent and prejudicial, whether the instruction to disregard, clearly removed its effect. We think there can be no question as to the prejudicial character of the testimony received. This testimony, together with that of the witnesses who claim to have heard defendant's threat to his wife, in the fall of 1906, supplied the only element of malice of which there is any direct evidence. There is reason to believe, from the apparently hostile attitude of some of the witnesses toward the defendant, that if the testimony withdrawn from the consideration of the jury

had not been heard by them, they might not have given credit to those witnesses who testified to the direct threat. Without these threats and the statement of Mrs. Rees, that she was afraid of him on account of his cruelty, the jury might have concluded that the killing was done in the heat of passion, without malice, or that defendant was in such condition from intoxication that he was unable to form a criminal intent. If the verdict had been one of manslaughter, the result would show that the testimony admitted was not harmful; but the verdict of murder in the second degree comprehends either express or implied malice, and we are clearly of opinion that the most reasonable conclusion is that the jury found express malice, basing their determination, in part at least, upon the illegal testimony. This testimony in itself, was sufficient to excite the passions and prejudices of an ordinary man, and we think the jury were unable to put it out of their minds and that they probably considered it, notwithstanding the positive injunction of the court. If they did, the verdict is against law.

The judgment of conviction and the order denying a new trial are reversed, and the cause is remanded with directions to grant a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.