STATE, RESPONDENT, *v.* SIMANTON, APPELLANT.

(No. 7,404.)

(Submitted June 10, 1935. Decided June 28, 1935. Opinion on Motion for Rehearing Filed September 30, 1935.)

[49 Pac. (2d) 981.]

Mr. *John A. Tressler* and Mr. *George E. Hurd,* for Appellant, submitted a brief; Mr. *Hurd* argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Enor K. Matson,* Assistant Attorney General, for the State, submitted a brief; *Mr. Matson* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The defendant, William Simanton, has appealed from a judgment of conviction of the crime of grand larceny on which he was sentenced to serve one year in the state prison, and from an order denying him a new trial.

The charge was the larceny of one "mouse-colored iron gray mare," the property of Joseph Le Carno. The appeal challenges the correctness of the court's rulings on the admission of testimony as to other like offenses, the sufficiency of the evidence to support the verdict and judgment, and certain instructions given by the court.

The evidence on behalf of the state sufficiently establishes the following facts: Joseph Le Carno had two "mouse-colored iron

gray" mare colts, foaled in 1932 and branded, in the spring of 1933, by Le Carno's son-in-law, David Pecora, with a brand registered in the name of Lucian Le Carno, son of Joseph Le Carno, which consists of a "lazy 4, lazy H," with a quarter circle under. In June, 1933, the defendant contracted to sell horses belonging to him and his brother Hugh to a horse buyer, and he, with Alfred Taylor and others in his employ, gathered and placed in the Simanton pastures approximately 125 head of horses, many of which did not belong to the Simantons. Under instructions from the defendant, all animals bearing brands other than those belonging to the Simantons were cut out and released, but all unbranded animals were held, and with these the two Le Carno fillies. About 90 head of horses and 33 colts remained and were driven to Malta for inspection and shipment. On the inspection the undersheriff in charge refused to pass the Le Carno fillies on the defendant's statement that they belonged to him and were sucking two of his mares; he did not show the mares to the officer. The officer informed the defendant that he would have to produce a bill of sale for the fillies, witnessed by two good witnesses, or an affidavit signed by two good stockmen of Phillips county; neither instrument was forthcoming. The defendant sought to secure an affidavit from Alfred Taylor and Dunc. Thompson, his employees, but they refused to sign it. Taylor testified that the defendant offered him $5 to do so. While the horses were still in the stockyards, the defendant met Lucian Le Carno on the street and told the boy that he had a pair of "blue mares" on "West Alkali" with the boy's brand on them, showing the boy the brand as a quarter circle *over* the lazy 4 H. The boy denied that the brand described was his, and repeated his denial on being taken to the sheriff, and there made his brand on a piece of paper; he was not told that the fillies were in the stockyard or permitted to see them. From the statement of one of the defendant's brothers, it would seem that the brand had been put on one of the fillies upside down so that the quarter circle did appear on top. On the stand, the defendant admitted that he had no personal knowledge of the fillies and had never seen them sucking mares belonging to him or to

his brother Hugh. He testified that he went on the statement of Alfred Taylor who had told him that he (Taylor) had seen one of the fillies sucking a "K E" mare, but this Taylor denied. In the winter of 1933 defendant caused a K bar B brand, owned by him, to be placed on the fillies and a bar run through the Le Carno brand, and, on the date on which he is charged to have stolen them, he branded them with his latest brand, "X over bar, over H."

Alfred Taylor left the employ of the Simanton Brothers in December, 1933, and was thereafter employed by the county as a stock detective; in this capacity he made two trips to the defendant's ranch in March, 1934, and reported what he had seen to the sheriff, who thereupon secured a search-warrant and thereunder took from the defendant's pasture a number of young animals freshly branded with defendant's brand, $\frac{X}{H}$, among them the two Le Carno fillies. Taylor was permitted to testify, over the objection of the defendant, as to his observations at the Simanton ranch. He testified, first, that in March he observed a mare belonging to one Tuttle, branded with Tuttle's brand and followed by a black unbranded colt, in the vicinity of the defendant's ranch; later saw the mare without the colt, and, on his visit to the ranch on March 25, 1934, saw the colt in defendant's corral, with other animals. He was then asked if at that time he saw other colts in defendant's corral which he had previously seen with their mothers, and, having answered in the affirmative, on the assurance of the prosecution that the matter would be later "connected up," was permitted to describe the animals in the corral. The witness stated that there were "8 or 10 clicks" (unbranded horses) in the corral, and that of these he recognized a colt from a pinto mare belonging to Chappel Brothers, whose brand is "CBC," and two colts from "Y6" mares, explaining that the "Y6" brand belonged to Jim Le Noir, the defendant's father-in-law; he said he also saw a two-year old gelding branded with a "K–D" belonging to one Baxter. The next day the witness picked up the Tuttle mare and the "CBC" pinto on the range and met the

sheriff and others at the ranch, where they took from the defendant's pasture the Tuttle colt, the Chappel Brothers colt, the Baxter colt, a colt from a "FC" mare, that brand belonging to one Jim Cotter, and the two Le Carno fillies—six head in all and all freshly branded with the defendant's $\frac{X}{H}$ brand.

Having been questioned somewhat concerning branding on the Simanton ranch, on cross-examination, the witness was asked on redirect as to that subject, and stated that, while he was working on the ranch, branding was done on January and July, 1933, and the only other branding he knew of was that in March, 1934. The witness testified that "people generally brand in the summer-time. The time they branded in the winter they got some colts around and branded them and brought them to town." He was then asked if he knew "the brands they had on." Objection was interposed on the ground, among others, that the examination was not proper redirect; the objection was overruled. The witness then testified that he saw one "FC" mare "bald faced colt off from her," which was Jim Cotter's brand.

The witness testified that five or six colts were branded at that time but that he paid no attention to them and did not know what brands were on the mothers. He was next asked concerning the branding in the summer of 1933, and over objection testified that "we" cut the colts back from five to six Y6 mares, a CBC mare and a black mare "belonging to Brown." He described the brand used at that time.

From the foregoing it will be seen that the case is unique, in that the defendant was charged with the larceny of an animal over which he had openly exercised dominion and control, under a claim of right, for at least a year prior to the date on which it is charged he stole it. With the facts relating only to the crime charged before them, the jurors might not have been willing to declare that they were convinced beyond a reasonable doubt that the defendant took the animal, as charged, from the possession of the true owner with the intent to steal it—an intent forming a necessary ingredient of the crime charged.

The prosecution sought to establish the existence of this felo-nious intent by proof that the defendant had committed other like offenses, which, to clarify the record, were as follows: On March 26, 1934, in addition to the two Le Carno fillies the defendant placed his $\frac{X}{H}$ brand on (a) the Tuttle colt; (b) the Baxter yearling; (c) the Chappel Brothers colt; (d) two Le Noir colts; (e) a colt from a mare branded F lazy Y; (f) a colt from a mare branded A triangle; (g) a Le Noir mule. In the winter of 1932–1933, the defendant likewise branded (h) the Cotter colt, and (i) five or six colts from mares whose brands the witness did not notice; and in the summer of 1933, branded (j) the Brown colt, and (k) five or six Chappel Brothers colts.

Here was proof of the stealing of approximately twenty animals, other than the one described in the information, if it was then established that they did not belong to the defendant or he had no right to brand them. When this plethora of evidence was adduced, the jurors may well have determined that, although the defendant's guilt with respect to the crime charged was not established beyond a reasonable doubt, by the evidence with respect to the animal charged in the information, it was clear that he had engaged in horse stealing on a large scale and should therefore be convicted of the only crime on which they could return a verdict.

It has been truly said that "the large majority of persons of average intelligence are untrained in logical methods of thinking and are therefore prone to draw illogical and incorrect inferences, and conclusions without foundation. From such persons jurors are selected. They will very naturally believe that a person is guilty of the crime charged if it is proved to their satisfaction that he has committed a similar offense, or an offense of an equally heinous character. And it cannot be said that this tendency is wholly without reason or justification, as every person can bear testimony from his or her experience, that a man who will commit one crime is very likely subsequently to commit another of the same character." (Underhill's Criminal Evidence, 3d ed., 187.)

Yet, even an habitual criminal is entitled under the law to a fair and impartial trial, and to be convicted, if at all, only on proof, beyond a reasonable doubt, that he committed the crime charged. It is for this reason that the general rule forbids the introduction of any evidence which will show, or tend to show, that the accused has committed any crime wholly independent of that offense for which he is on trial. To this rule, however, there are a number of important exceptions; the applicable exception here being that, in such a prosecution as this wherein intent is a material element of the crime charged, it is relevant to prove the commission of other crimes of a like nature, committed either before or after the act for the commission of which he is on trial. (Underhill, supra; *State* v. *Hall,* 45 Mont. 498, 125 Pac. 639; Wigmore on Evidence, 2d ed., secs. 316–346.)

It follows that all of the evidence outlined above was admissible to establish defendant's felonious intent, provided that, by supplementary testimony, the prosecution made out at least a prima facie case of guilt as to each of such purported other crimes. In order to make out a prima facie case as to each of the animals described, it was necessary to show that the animal was taken without the consent of the true owner. (*State* v. *Ebel,* 92 Mont. 413, 15 Pac. (2d) 233; *State* v. *Neely,* 90 Mont. 199, 300 Pac. 561.)

The evidence respecting the animals described in divisions (a), (b) and (c) was in each instance "connected up," in a manner not very satisfactory; as to (a) it was shown that the colt belonged to Tuttle and that the defendant had no authority to brand it, but some doubt was cast on the question as to what brand it bore, as Tuttle finally admitted that he could not read the "H" as a part of the brand which looked to him like $\frac{H}{I}$. Others had theretofore testified that the fresh brand on the colt was $\frac{X}{H}$. It further appears that the defendant did not use a "stamp" branding iron but "wrote" his brand with a hot iron, and it was for the jury to say whether or not he branded the colt even though it might appear that the "H" was not completed.

As to the Baxter colt (b) there was evidence by the defendant that the curve of the "D" in the K–D brand was broken, and the defendant testified that he thought it his K–B, but this' testimony presented merely a question of good faith for the jury's determination.

As to (c), one Rufus Warrior testified that he had been ranch foreman for Chappel Brothers for six years; that he "had never delivered or turned over to * * * defendant any mare branded CBC, nor * * * authorized the defendant to place the X over bar over H on any colt following a CBC mare." This evidence is rather unsatisfactory, as it does not disclose that the "ranch foreman" had exclusive, or any, authority to dispose of the company's livestock. It cannot be considered as "connecting up" the testimony designated (k), as the defendant did not use the brand described after December, 1933, when he registered it.

The court by instruction withdrew from the jury's consideration the testimony designated (e), (h) and (j).

No attempt was made to "connect up" or to withdraw from consideration the testimony with respect to the remaining divisions indicated, nor was any motion made, either by the prosecution or defense, to have this formidable testimony withdrawn.

The court instructed the jury that "some evidence has been admitted concerning the alleged commission of other offenses of a similar character, claimed to have been committed by the defendant at or near the time of the alleged offense upon which the defendant is now on trial. * * * Such evidence was admitted * * * solely for the purpose of its bearing, if any it has, in aiding you to determine whether the defendant at the time he appropriated (if he did appropriate) the mouse-colored iron gray mare * * * described in the information, intended to steal such mare; and you cannot consider such evidence for any other purpose. The defendant is not on trial charged with the stealing of any animal other than the mare described in the information. If you do not believe from the evidence beyond a reasonable doubt that he is guilty of the

charge contained in the information then you should acquit him, irrespective of the evidence relating to other similar offenses.'' This instruction authorized the jury to consider not only the evidence tending to show that the defendant had stolen the three animals connected up as above indicated, but the mass of testimony indicating that he had branded a dozen or more animals not his own, which to the lay mind might be considered proof of other crimes, but which was clearly inadmissible.

The Attorney General contends that, conceding that the evidence was inadmissible, defendant waived his right to urge reversal on this ground by failing to renew his objection by motion to strike and request for an appropriate instruction to disregard the testimony. This is the general rule in civil cases (64 C. J. 203, and cases cited), and it has been applied in at least one state in criminal cases. (*Stone* v. *State,* 118 Ga. 705, 45 S. E. 630, 635, 98 Am. St. Rep. 145; *Mitchell* v. *State,* 152 Ga. 375, 109 S. E. 357; *Page* v. *State,* 23 Ga. App. 548, 99 S. E. 55; *Davis* v. *State,* 25 Ga. App. 532, 103 S. E. 819.) The rule as announced in the *Stone Case* is that: ''Where incompetent evidence is admitted on the statement that it will be subsequently connected and made admissible, it is the right of the objecting counsel to renew his motion at a later stage of the trial; and, if the connection has not been made, it will then be the duty of the court to exclude the testimony, with proper instructions to the jury not to be influenced thereby. But it cannot be expected that in a long and tedious trial the court should bear these matters in mind, and of his own motion exclude what has been thus provisionally admitted. It is for counsel interested to remind him of the circumstances, and have it ruled out, if he so desires. It may often happen that counsel may prefer to let the evidence remain in the record. Subsequent testimony may make the former evidence helpful to the party who originally objected. At any rate, if counsel remain silent, the court is authorized to conclude that the party regards the evidence admitted as immaterial, not hurtful or possibly helpful.''

This is a salutary general rule and should be applied on appeal in criminal cases, at least with respect to testimony relating to the crime charged in the information, as the evidence referred to in the *Stone Case* did. It is the duty of counsel in a criminal case to protect the interest of his client at every stage of the proceeding, and this duty includes the interposition of timely objection to inadmissible testimony improperly in the record and the presentation of appropriate instructions.

This rule is not in conflict with the rule that, "when a party has seasonably objected to evidence of a certain character and his objection has been overruled, proper decorum would indicate that he should not thereafter interrupt the course of the trial by constant repetition of his objection" (*State* v. *Jones,* 48 Mont. 505, 139 Pac. 441, 446), which rule applies only to repeated objection to the same line of testimony and not to the situation presented here, wherein, as in the Georgia cases cited, the objectionable testimony was only admitted on the assurance that it would be connected up by other competent evidence. However, in just such circumstances as appear in the case at bar, this court reversed a judgment, although the defense had neither "renewed" its objection by motion to strike nor asked for an instruction withdrawing the inadmissible evidence from the consideration of the jury. (*State* v. *Ebel,* 92 Mont. 413, 15 Pac. (2d) 233.)

In determining the course to be followed in the trial of the instant case, counsel for the defense was justified in relying upon the action of this court in the *Ebel Case,* assured in mind that this court would follow that decision, so recently handed down, in considering this appeal. Therefore, in justice to counsel and to the end that the profession generally should not be imbued with a feeling of uncertainty in the trial of cases and in advising clients, the judgment in the present case should not be allowed to stand by invoking the Georgia rule at this time, whatever rule we may now announce for the future. This declaration is in accord with the beneficent rule of *stare decisis* with respect to trade and property rights (*Sunburst Oil & Re-*

*fining Co.* v. *Great Northern Ry. Co.*, 91 Mont. 216, 7 Pac. (2d) 927, affirmed in 287 U. S. 358, 53 Sup. Ct. 145, 77 L. Ed. 360, 85 A. L. R. 254), of which it has been said: "The relaxation of the doctrine * * * offers to the progressive court a chance to keep its case law up to date; it makes a strong appeal to common sense." (See 29 Illinois Law Journal, 8, and 19 Journal Am. Judicature Soc., p. 37.)

The question of the waiver of the right to urge error was not raised in the *Ebel Case* and will now be considered for the purpose of announcing the rule on the subject for the future.

Conceding that the Georgia courts have announced the correct general rule, the fact remains that, with respect to the class of evidence here considered, admissible, if at all, only for a limited purpose, the withdrawal of it from the consideration of the jury on motion and by appropriate instruction is ineffective unless this court can say, on the record, that such action "clearly removed its effect." (*State* v. *Rees*, 40 Mont. 571, 107 Pac. 893, 896, and numerous cases therein cited.)

The clearest exposition of this exception to the general rule is found in the old case of *State* v. *Meader*, 54 Vt. 126, as follows: "Oftentimes evidence, standing alone, when offered is clearly inadmissible, and requires the aid of supplementary proof to be made competent. The convenience of the party or the exigencies of the case, may render it eminently proper for the court to allow it to come in under an assurance that the necessary supplementary proof shall be supplied. But, in all cases it is obvious that improper evidence, however it gets into the case, and with whatever motive it may be offered, is liable to work mischief to the adverse party. * * * Good faith of counsel * * * does not change the character of the evidence itself. The court may attempt to destroy its mischievous effect, by instructing the jury to ignore it; but there is no certainty that the attempt will be successful. Accordingly, it is now the settled law in this state, that illegal evidence, if objected to, though admitted under an offer to so connect it with other proofs as to make it competent, will vitiate a verdict for the party offering

it, if the proposed connection is not established, unless the court is able to say affirmatively, that such evidence worked no injury to the adverse party. It is not apparent how any embarrassment can arise in the trial of cases under this rule. The party offering such evidence is simply compelled to take the risk of the experiment. If he fails, he, not his adversary, should be the loser.'' This exception to the general rule is recognized on appeal in civil cases as well. (*C. M. Spring Drug Co.* v. *United States,* (C. C. A.) 12 Fed. (2d) 852; *Hopt* v. *Utah,* 120 U. S. 430, 7 Sup. Ct. 614, 30 L. Ed. 708; *Remus* v. *United States,* (C. C. A. 6) 291 Fed. 501.)

Thus, while under the general rule the duty is imposed upon counsel for the defense to call the lapse to the attention of the court by motion to strike, even the order striking the evidence and appropriate instruction to the jury to disregard it do not protect the prosecution from a reversal, if the evidence is of such a nature that the appellate court cannot say that the withdrawal removed its effect from the minds of the jury. This being so, if proper objection is interposed to the admission of the evidence in the first instance, ''the general objection may avail on appeal.'' (*Throckmorton* v. *Holt,* 180 U. S. 552, 21 Sup. Ct. 474, 480, 45 L. Ed. 663; *Waldron* v. *Waldron,* 156 U. S. 361, 15 Sup. Ct. 383, 39 L. Ed. 453, 455.)

A careful reading of the Georgia cases on the subject will disclose that no one of them would come within this exception to the rule there announced, and that the exception was recognized in the case of *Page* v. *State,* above, where it is said: ''The admission of this evidence could hardly have affected the jury and caused them to find a verdict of guilty, if without this evidence they would not have done so.''

In the peculiar circumstances presented by the evidence with respect to the crime here charged, we cannot say that, on it alone, or with the addition of the testimony concerning the three animals, connected up in the manner above shown, in order to supply the necessary element of felonious intent, the jury would have returned a verdict of guilty had it not been for the accumu-

lation of evidence of this nature by showing three additional crimes, not connected up.

It follows, logically, that the record would now be in the same condition in which it is presented, had the defense ''renewed'' its objection by motion to strike and had the court included all of the incompetent and illegal evidence in its instruction to the jury to disregard it. The conclusion which the Georgia court said was authorized by failure to renew the objection by motion to strike, while proper in the *Stone Case,* could not reasonably be drawn in such a case as this.

It is therefore apparent, under all of the authorities in cases of this character, that when the ''general objection'' has been interposed to this class of testimony, the failure to move to strike or to withdraw the testimony from the jury's consideration, or even its withdrawal, is not vital on appeal to the position taken by either the prosecution or the defendant with reference to it.

On the one hand, ''after hearing the appeal, the court must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties.'' (Sec. 12125, Rev. Codes 1921.) Whereupon, even though the court erred in admitting the evidence and refused to strike it out, the error may not be fatal for the reason that no prejudice appears in the record. On the other hand, though counsel and court do all in their power to cure the error committed, it may yet result in a reversal, if the appellate court cannot see that the technical withdrawal accomplished its purpose. Therefore, under the authorities, it is a dangerous practice, in criminal cases especially, to admit evidence of this nature unless it is manifest that it can be properly connected up by other testimony. When evidence of other crimes is offered, and timely objection interposed, the trial court should adopt some method of insuring the defendant against the lodgment in the minds of the jurors of facts and circumstances which cannot but create a prejudice against the defendant, and which, if not thereafter made admissible, may result in the escape from justice of a

██ guilty person. We would suggest that, for the protection of both the defendant and the prosecution, when such testimony is offered and objection interposed, the court require the prosecution to disclose, in the absence of the jury, the nature of the proposed supplementary testimony to the end that the court may intelligently rule in advance as to whether or not the evidence should go to the jury.

As this cause must be remanded for a new trial, we will take up such further questions as may arise on such trial.

It is contended that error was committed in permitting the ██ state to go beyond the scope of proper redirect examination in eliciting from Taylor the additional statements above noted, but there is no suggestion of prejudice suffered. If the evidence could not be thus adduced under the rules of evidence, Taylor, with the court's permission, could then have been recalled for further examination and the same result reached. The scope of redirect examination is in the discretion of the trial court, and, while it should ordinarily be confined to the scope of the cross-examination, the court may permit a relaxation of the rule. No error can be predicated where the court's discretion has not been abused. (70 C. J. 698, 701.) In the absence of a showing of prejudice resulting, if error was committed it was but technical and for such error this court may not disturb the judgment. (Sec. 12125, supra. See, also, *State* v. *Fox*, 52 Idaho, 474, 16 Pac. (2d) 663, and cases cited.)

As we have held that evidence of other crimes committed either before or after the alleged commission of the crime charged is admissible to prove felonious intent it is immaterial whether the defendant is found to have stolen the animal, if he did steal it, on the date charged or when he first took it into his possession, as both dates are within the statute of limitations.

It is contended that the court erred in denying the jury power ██ to suspend the sentence and place the defendant on probation. There is no merit in this contention. While the jury may, if they see fit, assess and declare the punishment in their verdict (sec. 12027, Rev. Codes 1921), it is the court which

pronounces judgment and sentences the defendant (secs. 12055, 12056, Id.), and the court only can suspend the execution of the sentence and place the defendant on probation (sec. 12078, Id.). The court's instruction on this subject was correct.

It is finally contended that the evidence is insufficient to prove a felonious intent and that therefore the court erred in refusing to grant the defendant a new trial. Of course there is no direct evidence of the defendant's intent; such evidence is usually impossible to procure and therefore the law provides that the intent is manifested by the circumstances connected with the offense and the sound mind and discretion of the accused. (Sec. 10727, Rev. Codes 1921.) It is true that the defendant has a plausible explanation of his claim to the animal in question, made on his assertion of what he was told by Taylor as to the mare sucking one of Hugh Simanton's mares and produced a bill of sale from Hugh Simanton said to have been executed in July, 1933. But the court and jury were at liberty to disbelieve the testimony on behalf of the defendant; his statement respecting Taylor was denied by Taylor.

The refusal to grant a new trial for insufficiency of the evidence will not be disturbed on appeal where the evidence was conflicting and tended to support the verdict. (*State* v. *Hurst*, 23 Mont. 484, 59 Pac. 911.)

For the reasons stated, the judgment and order are reversed and the cause remanded to the district court of Phillips county for a new trial.

ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.

MR. CHIEF JUSTICE SANDS, absent on account of illness, takes no part in the foregoing decision.