STATE, RESPONDENT, *v.* HURST, APPELLANT.

[No. 1,428.]

[Submitted January 2, 1900. Decided January 29, 1900.]

*Criminal Law—Homicide—Evidence—New Trial— Witnesses —Impeachment—Jury—Instructions—Argument of Counsel —Review—Bill of Exceptions.*

1. Evidence reviewed and, *held*, to justify a verdict of guilty of murder.
2. A witness' credibility and the effect to be given his evidence are for the jury to determine.
3. The appellate court cannot try a case *de novo*, and thus invade the province of the trial court by passing upon disputed questions of fact and the credibility of witnesses.
4. Refusal to grant a new trial of a criminal case for insufficiency of evidence will not be disturbed on appeal where the evidence was conflicting, and tended to support the verdict.
5. Where a witness based her testimony that threats against deceased were made by defendant on her recognition of his voice, it was not error to exclude evidence tend-

ing to show that such witness had mistaken the voice of another person on a different occasion, where it was not shown that the conditions were the same.

6.  It was not error to allow the state to ask defendant's witness a question on cross-examination for the purpose of laying a foundation for his impeachment which was not germane to his direct testimony, since the state could have recalled the witness at any time for such purpose.

7.  Under Code of Civil Procedure, Sec. 3380, declaring that a witness may be impeached by evidence that at other times he made statements inconsistent with his present testimony, a witness having denied making statements at a coroner's inquest, the state was properly allowed to call another witness in rebuttal, who was present when such statement was claimed to have been made, and ask him whether the former witness made a certain statement just after he finished his testimony before the coroner.

8.  Where a jury in a criminal case had been fully instructed as to their individual duties under the law, it was not error for the court to refuse to instruct that if, after consideration of the whole case, any juror entertained any reasonable doubt of the guilt of the defendant, it was the duty of such juror not to vote for a verdict of guilty, nor to be influenced in so voting for the single reason that a majority of the jury were in favor of a verdict of guilty.

9.  On appeal, alleged objectionable statements of counsel in argument cannot be considered, nor the action of the trial court thereon be reviewed, unless they, and the ruling of the court thereon, are preserved in a bill of exceptions and properly certified.

*Appeal from District Court, Dawson County; Charles H. Loud, Judge.*

JOSEPH HURST was convicted of murder, and he appeals. Affirmed.

*Mr. William Wallace, Jr.*, *Mr. H. J. Haskell*, *Mr. G. W. Myers*, and *Mr. C. R. Middleton*, for Appellant.

*Mr. Thomas C. Holmes*, and *Messrs. Strevell & Porter*, for the State.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the Court.

The defendant was convicted of murder in the first degree on March 21, 1899, and on the following day was sentenced to suffer the death penalty. A motion for a new trial was denied on June 10, 1899. The appeal is from the judgment and the order denying a new trial.

The grounds relied upon for a reversal of the judgment and order are insufficiency of the evidence to sustain the verdict, errors of the trial court in rulings upon the admission and

exclusion of evidence and in a refusal to properly instruct the jury, and misconduct of the counsel for the state which was prejudicial to the defendant.

The record discloses these facts:   Dominick Cavanaugh, the deceased, was the sheriff of Dawson county.   At the general election held on November·8, 1898, he was a candidate for re-election, and was successful.   The defendant was also a candidate upon the opposition ticket.   The deceased had his office and resided with his family in the court house building in Glendive, the county seat.   The subjoined diagram of a part of the townsite of Glendive shows the place of the homicide and the other points referred to in the proof.

| A | Hurst residence. | K | Duncan cottage, residence of Steele. |
|---|---|---|---|
| B | Yellowstone Hotel. | L | Duncan block and office. |
| C | M. Cain, saloon. | M | Dr. Hunt's residence. |
| D | Douglas & Mead, bank and store. | N | Cavanaugh's barn. |
| E | Agnew & Gilles, barber shop. | O | Court house. |
| F | Foster's bakery. | P | Side gates Hunt's residence. |
| G | Drug store where fair was held. | Q | Where Myers Bros. stood on night of |
| H | Masonic Block. | | murder. |
| I | Postoffice. | R | Wood pile. |
| J | Lowry & Eaker, meat market. | X | Vacant lot, 50 feet wide. |

The business portion of the town fronts on Merrill avenue. The court house fronts on Bell street at the point O.   At N is a small stable appurtenant to the court house, and which was used by deceased.   It opens back upon the alley, marked

"20," by two doors, the larger of which is at the middle of the building. This alley is open from Douglas avenue to the back of block 8. Between I and J in block 8 is a vacant lot. This is made use of as a passageway by persons going from Merrill avenue by way of the alley toward Douglas avenue. From the stable to Merrill avenue by way of the alley and vacant lot is about 240 feet. Early on the morning of December 24, 1898, the dead body of Cavanaugh was found lying face downward diagonally across the alley, near the large door of the stable, the feet being toward the stable and the head toward Douglas avenue. The face was frozen in a pool of blood. The body was stiff. Near it was found the hat of deceased, and also a book, wrapped in Manilla paper. This book and a pair of cuff buttons he had purchased the previous evening at the store marked "F" on Merrill avenue. The effects upon the body were undisturbed. Upon the scalp were eight or nine wounds, made by some blunt instrument, all of which penetrated the flesh and crashed through the tables of the skull into the brain. Upon the right side of the hat were found traces of iron rust and indentations resembling screw threads over a space of two inches. There was a corresponding wound on the right side of the head, showing the skull crushed in. Physicians examined the skull, and found it broken into 35 pieces, and they were of the opinion that the wounds had been inflicted by means of a heavy iron bolt. Each of the wounds was fatal. The last time the deceased was seen alive was about 8:24 o'clock on the previous evening. After buying the book and cuff buttons at F, he left there, saying he was in a hurry to reach home. He then went into the postoffice at I. After remaining there a few minutes, he left. The time is fixed by Miskimmen, the postmaster, at about 8:24. The deceased passed over the vacant lot between I and J, and within a few feet of the point R. At this point he recognized and spoke to Frank Gilmore, a witness for the state, but did not stop. Gilmore had just thrown off a load of wood, and was preparing to take his team home. The night was clear, and the moon was bright. At a distance of 30 or

35 feet behind deceased, and going at a somewhat faster pace, there followed another man, wearing a sack coat and hat, whom Gilmore recognized as the defendant. He is somewhat taller than was the deceased. He passed within 9 or 10 feet of the witness, but did not speak. He had his right hand in the pocket of his pantaloons or under his coat, so that the coat projected behind. As he passed on he seemed to be over-taking Cavanaugh. The witness then turned his team into Merrill avenue between I and J, and went along the avenue to the right. A short distance from J he passed the witnesses Steele and wife, who were going to their home at K. These latter passed along Merrill avenue to J, and then turned to the left to reach their home. As they came towards it, Mrs. Steele saw two men, one taller than the other, standing near the point P, apparently engaged in conversation. The presence of the men there at that hour was such a strange circumstance that she twice called her husband's attention to them. As these witnesses turned into their house, the two men started in the direction of the stable, the taller following the other. The witnesses then lost sight of them. Going into the house, Mrs. Steele lighted the lamp. It was then 8:25 o'clock. The residence of Dr. Hunt is at M. On this evening he and his wife had walked up to a drug store at G, and had returned home about 8:20. A minute or two later a patient called and obtained a prescription. While engaged in writing the prescription, and between 8:20 and 8:35, Dr. Hunt heard a sound in the direction of the Cavanaugh stable, described by him as a muffled voice sound mixed with other sound, all of which he supposed was made by some one at the stable. He called the attention of the patient to it, who stated that it was probably some "kids" in the alley. On the same evening, between 8 and 8:30 o'clock, John and Lawrence Myers were passing along Douglas avenue. At the point Q they heard twice in quick succession a sound described by one of them as a "kind of a holler like a body holding their hand over their mouth hollering." One of them says it was the sound of a muffled voice. The sound was in the direction of the Cavanaugh sta-

ble, and, looking in that direction, they saw the form of a medium-sized man, slightly stooped, walking rapidly away from the mouth of the alley at the stable into the street.   He disappeared behind the stable along Kendrick avenue, and was not seen by them again.   These witnesses could not describe the clothing of the man they saw.   The distance he was from them was 60 or 75 yards.   Though the moon was bright, they noticed nothing else in the alley.

Cavanagh had left his home at the court house a·little after 7 o'clock, and had been in various places along Merrill avenue until he started from the postoffice on his return.   The defendant had also been into various places along Merrill avenue during the evening.   After making some purchases, he was seen going towards his home at A about 7:30.   The proof shows the he probably went home at that time to leave his purchases, and afterwards returned to Merrill avenue, for he was seen again going towards the postoffice at 8 o'clock.   As Dr. Hunt and his wife went into the drug store at G a little before or after this time, the defendant was passing out.   Dr. and Mrs. Hunt greeted him.   He had a package under his arm, done up in light paper.   It was as large as a quart bottle, and from 12 to 16 inches in length.   Exactly at 8:30 the witness Agnew says that Hurst passed his barber shop at E, going in the direction of his home.   At that time, though accosted by Agnew, he made no reply, but passed on in silence. He had no package.   There is a sharp conflict in the evidence as to the dress worn by defendant, but there is evidence tending to show that he had on a sack coat of brown duck, overalls, and a dark hat.   Another witness saw defendant a moment after Agnew saw him; he was then still going toward home.   Besides these instances, no other witness saw defendant during the time after 8 o'clock, except Gilmore, as before stated.

Defendant's wife was upon the stand, but she made no statement as to defendant's movements during that evening, nor as to the clothing he wore.   Several days after the homicide a search was made of defendant's house.   A pair of over-

alls were found, hanging in a closet; they were over a pair of dark pantaloons. In the pockets of the pantaloons were found two handkerchiefs. Upon the overalls and one of the handkerchiefs were found bloodstains. On the morning the body was discovered, and while a number of people were assembled at the court house, where the body lay, the witness Gilmore met the defendant at a point on Bell street, from which they could see the people at the court house, and spoke to defendant about the murder. Defendant appeared nervous, and looked several times toward the court house. He said nothing of the death of Cavanaugh, but began at once to speak about getting some one to call for a dance to come off a few nights afterwards.

On several occasions a short time before the murder the defendant was heard to make threats against deceased, apparently prompted by hostile feelings aroused by their political contest and defendant's defeat. On the evening of the day of election he was overheard by the witness Nellie Ward talking with another person. She was passing from the court house, where she had been to take supper to the judges of election, to the building at G, which was not then occupied by any business. On that evening the women of the Catholic church held a fair there. It was about 6:30 o'clock, and dark; and as she passed the alley in the rear of this building she heard a part of the conversation, as follows: The strange voice said that "Dominick would get it." A voice, which she recognized as defendant's, replied that "If the s— of a b— did, he would never see the new year." She saw the men, but did not recognize either by sight. On the night after election, in speaking of the result, the defendant told the witness Bonney that Cavanaugh had done him dirt, and that he would "fix him." Three or four days later, in speaking of the election to the witness Schwanke, and in reply to an inquiry by Schwanke as to how he felt over it, he said, "I would have been elected, but he played me dirty tricks; but I will get even with him." On the next day after the murder the defendant began to lay his plans to be appointed to the office of sheriff as the successor of Cavanaugh.

The foregoing is a brief statement of the salient parts of the evidence. We have made no attempt to set out a complete analysis of it, nor shall we. The jury having found all these facts established beyond a reasonable doubt, as they must have done, they were led irresistibly to the conclusion that the defendant is guilty of the murder of Cavanaugh. We have given our attention carefully and patiently to the examination of the whole of the evidence, and we cannot say that the result reached by the jury is not justified by it, or that there is, upon the whole of the evidence, a reasonable doubt of the defendant's guilt. Counsel for defendant predicates his main attack on the verdict upon the assertion that the only evidence in the record tending to connect the defendant with the crime is that of the witness Frank Gilmore; that the identification of the defendant by this witness as the man who followed the deceased along the alley a few minutes before the homicide, is unsatisfactory at best; and that, in addition to this, the witness was shown to have made so many contradictory statements about the matter that he should not be believed. It is true that this witness had been examined at the coroner's inquest and at the preliminary examination, and that he was shown to have been evasive and contradictory in his statements at these times. It was further shown that he had been evasive and contradictory in speaking of the matter on other occasions. At the trial, however, his identification of the defendant was clear and positive. He also explained his previous inconsistent statements by telling the jury that he was at first reluctant to tell what he knew about the case, and thus to be the instrument of bringing condemnation upon the defendant, whom he looked upon as a friend, and as not capable of committing such a crime; but that, after a struggle with his conscience, he had determined that it was his duty to tell the facts, and let the law take its course. He also stated, in substance, that many persons had questioned him about the case, whom he deemed to be prompted by curiosity or, perhaps, less worthy motives, and that he did not think he was bound to gratify

them by stating the facts to them.   The jury heard the whole
of his statement and the contradictory evidence.   They saw
him, and had an opportunity to observe his manner upon the
stand.   His credibility and the effect which was to be given
his evidence were clearly for the jury to determine.   They
were fully instructed as to their power and duty in weighing
the evidence, and this Court cannot say that they abused their
power or disregarded their duty.   Moreover, the trial judge
saw and heard this witness testify.   It was within his province
if not satisfied with the verdict, to set it aside and grant a
new trial.   This he refused to do.   We cannot say that he
abused his discretion.   This Court cannot try the case *de novo*
and thus invade the province of the trial court by passing
upon disputed questions of fact and the credibility of wit-
nesses.

Counsel contends further that the evidence shows that the
defendant was upon Merrill avenue, at the barber shop at F,
at 8:30 o'clock and that, therefore, he could not have been
present at the scene of the homicide at the time it occurred.
The whereabouts of the defendant at the time of the homicide
was a controverted fact, and the finding of the jury thereon
cannot be disturbed.   Besides, admitting that he was seen at
8:30 o'clock on the street near the barber shop, going in the
direction of his home, this fact does not show that the finding
of the jury was wrong.   Under the evidence on this point the
distance from the scene of the crime to that point could be
covered by a person walking rapidly in two or three minutes.
The proof also shows that the homicide must have occurred
not more than a minute or two after 8:25.   The defendant
could, therefore, have committed the crime, and then have
gone to the barber shop on Merrill avenue afterwards.

2.   In testifying to the threat which she heard defendant
make against the deceased on the evening of election day in
November, the witness Nellie Ward, stated in reply to a ques-
tion by defendant's counsel, that she could not be mistaken in
the voice of defendant.   In rebuttal defendant called Dustin
Gibson.   After stating that he had had a speaking acquaint-

ance with Nellie Ward for a long time, and that he had met her one evening, after dark, the fall before, at the house of one Mrs. Schick, the witness was asked: ''Now, I will ask you Mr. Gibson, if she did not, not seeing you, but from the tone of your voice, mistake you for Mr. Voorhies?'' Upon objection the court refused to permit him to answer, on the ground that the evidence thus sought was incompetent. This ruling is assigned as error. Evidently the idea in the mind of counsel was that, if the witness Nellie Ward had made a mistake in identifying Gibson by his voice, she might also have been mistaken in her identification of the defendant. The purpose, therefore, was not to contradict this witness, as counsel stated, but to prove a fact from which the jury might infer that her observation was at fault. The answer to the question could not have shown any statement made by Nellie Ward at that time inconsistent with her opinion or conclusion as stated by her when upon the stand. It was, therefore, not competent for this purpose, as claimed by counsel. Nor do we think the mere fact that the witness made a mistake in the voice of Gibson at that time was competent as tending in any way to show that her observation was at fault at another time, and under conditions which may have been altogether different. The principle involved is somewhat analogous to that which permits proof, in certain cases, of experiments made for the purpose of showing that a person could or could not see or do something which he claims that he saw or did. ''Under some circumstances this class of testimony may be very satisfactory, but, unless the experiments are shown to have been made under essentially the same conditions, the tendency is to confuse and mislead, rather than enlighten, the jury.'' (*Lake Erie & W. Railway Co.* v. *Mugg*, 132 Ind. 168, 31 N. E. 564.) This case is approved in *Burg* v. *Chicago*, *etc.*, *Railway Co.*, 90 Iowa 106, 57 N. W. 680, and the same rule is followed by other courts. (*Wilson* v. *State* (Tex. Cr. App.) 36 S. W. 587; *Chicago & A. Railroad Co.* v. *Legg*, 32 Ill. App. 218; *Elgin J. & E. Railway Co.* v. *Reese*, 70 Ill. App. 463; *Byers* v. *Railroad Co.*, 94 Tenn. 345, 29 S. W.

128.) Counsel made no offer to show that the conditions existing at the time the mistake was made in recognizing Gibson were in any degree similar to those existing at the time in question. Assuming that the evidence would have been competent had the offer been so made as to bring it within the principle of these cases, the trial court committed no error in rejecting it as offered. Whether, if Nellie Ward's attention had been called to the occurrence at Mrs. Schick's, and she had denied it, it would have been competent to contradict her, we do not decide, as the question does not arise.

3. The witness Gilmore, upon cross-examination by defendant's counsel, stated that on the day after the homicide, and at the barn where he and Dustin Gibson kept their horses, he had told the latter that the man he saw following Cavanaugh was the defendant. On redirect examination he gave the details of the conversation, and stated further that it was agreed between him and Dustin Gibson that they would say nothing of the matter to any person. Gibson, called by the defense to impeach Gilmore, denied that the conversation had occurred as Gilmore asserted, and stated that Gilmore had not told him that he recognized the defendant as the man following deceased on the evening of the homicide. He also stated that Gilmore had not mentioned the defendant in any way in connection with the murder until about the middle of the following week, and after Gilmore had been examined as a witness at the inquest. He then left the witness stand, but was recalled to impeach Nellie Ward's testimony. This part of his testimony was excluded, as already noted. The court at this time, over the objection of defendant, allowed counsel for the state to cross-examine him, to lay the foundation for impeachment as to a conversation had with one George Schnick on the 26th or 27th of December after the murder, in which he told Schnick that Gilmore claimed that Hurst was the guilty party, but that Schnick should say nothing about it. Counsel contends that the evidence brought out was immaterial, and that the ruling was error. Counsel is clearly wrong. It was important for the state to contradict Dustin Gibson by show-

ing that he had knowledge at that time that Gilmore asserted that Hurst was the guilty man, and that he had gained this knowledge from Gilmore,—facts entirely inconsistent with the statement made by him upon the stand, and materially corroborative of Gilmore's testimony.

Counsel say that the court erred in permitting any cross-examination of this witness, because he was not permitted to testify to anything in chief, and his cross-examination related to matters wholly foreign to the subject upon which he had been questioned by the defense.   This is true.   But while he was on the stand counsel for the state desired to lay the foundation for impeachment by asking about the statements mentioned.   They would have been permitted to recall him for this purpose at any time.   It was a matter entirely within the discretion of the court.   There was no error in the ruling.

4.   At this time the witness Gibson was also asked if he did not, during the coroner's inquest, and while he was upon the stand as a witness, state, in presence of Burdick, the coroner, and others there present, that Gilmore had told him on the 24th or 25th of December that Hurst was the man he saw following deceased down the alley.   He answered in the negative.   Burdick was afterwards called to contradict him.   The question put to Burdick did not refer to the time during which Gibson was on the stand, but to a time just after he had finished his testimony.   Objection was made that the foundation had not been properly laid for the impeachment, because the question referred to a different time from that to which Gibson's attention had been called.   The court overruled the objection, and defendant excepted.   Burdick directly contradicted Gibson.   The question put to Gibson sufficiently met the requirements of Section 3380 of the Code of Civil Procedure touching the circumstances of time, place and persons present, to notify him of the statement referred to and to which Burdick testified.   The objection was extremely technical.   There was no error in disregarding it.

5.   Error is assigned upon the refusal by the court to give instruction No. 13 requested by the defendant, as follows:

"If, after consideration of the whole case, any juror should entertain any reasonable doubt of the guilt of the defendant it is the duty of such juror so entertaining such doubt not to vote for a verdict of guilty, nor to be influenced in so voting for the single reason that a majority of the jury should be in favor of a verdict of guilty." The propriety of giving this instruction was considered in *People* v. *Dole*, 122 Cal. 486, 55 Pac. 581, the court saying of it: "This is a correct statement of the duty of a juror, and should have been given. If any juror needed an instruction upon this point, it was harmful to refuse it; if no juror needed the instruction, it would have been harmless to give it." An examination of the record in this case shows that the court carefully instructed the jury as to their duties in instructions Nos. 9, 13, 17, and 38. We agree that the instruction as asked is a correct statement of the law as to the duty of a juror, but we also think that the general instructions submitted in this case were amply sufficient to guide the individual jurors in the performance of their duties under the law. The court had heard the individual jurors examined. It had witnessed their behavior during the progress of the trial. It was discretionary with the court to instruct the jury more specifically with reference to their individual duties, the exercise of this discretion to be determined by the observations made by the court during the examination of the jurors and their conduct during the trial. If the court thought proper to give the instruction, it was proper to give it. On the other hand, if the court thought the jury did not require the instruction, it was not abuse of discretion to refuse to give it. There is some conflict of authority as to whether the court should instruct the jury in matters of this kind. We agree in the main with what the Supreme Court or Iowa said on the subject of such instructions in *State* v. *Hamilton*, 57 Iowa, 596, 11 N. W. 5: "Of course, each juror is to act upon his own judgment. He is not required to surrender his convictions unless convinced. He may be aided by his fellow jurors in arriving at the truth, but he is not to find a verdict against

his judgment merely because the others entertain views different from his own.  But a jury need not be advised of so simple a proposition.  The usual method of instructing upon the measure of proof required in criminal cases is sufficient.''

6.  Complaint is made that counsel for the state, during the argument to the jury, were guilty of misconduct prejudicial to the defendant, in that they went outside of the record, and stated matters of fact to the jury.  The record fails to show in any authentic form what counsel did say.  True, it appears that counsel for defendant several times interrupted the argument of counsel for the state to interpose objections to statements claimed to be not warranted by the proof, but the objectionable statements were not taken down, nor was a formal ruling of the court obtained, and exception saved.  However objectionable the statements of prosecuting counsel may be, this Court cannot consider them, nor review the action of the trial court thereon, unless they, with the ruling of the court thereon, are preserved in a bill of exceptions, and properly certified.  The rule was stated by this Court in *State* v. *Biggerstaff*, 17 Mont. 510, 43 Pac. 709, as follows:  ''We think the great weight of authority is to the effect that, in order to bring the language complained of before this Court for review, it was necessary for the defendant to request and secure a ruling of the court thereon, and properly save an exception to such ruling in a bill of exceptions.  The bill of exceptions in the case presents no such record or action of the court as to authorize us to pass upon the language of the county attorney. It was never properly raised and passed upon by the lower court.  It cannot be raised here for the first time.''  (See, also, *State* v. *Cadotte*, 17 Mont. 315, 42 Pac. 857.)

There being no error in the record, the judgment of the district court and the order denying the motion for a new trial are affirmed.

*Affirmed.*