STATE, RESPONDENT, *v.* WALLETTE, APPELLANT.

(No. 7,685.)

(Submitted December 10, 1937. Decided January 3, 1938.)

[75 Pac. (2d) 799.]

16

*Mr. John L. Slattery,* for Appellant, submitted a brief, and argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, and *Mr. N. A. Rotering,* First Assistant Attorney General, for Respondent, submitted a brief; *Mr. Hugh N. Marron,* of Counsel, argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

By information filed in the district court of Roosevelt county, the defendant was charged with the larceny of one grey mare branded Yn on the left hip, the property of Lizzie P. Arthur. The defendant entered a plea of not guilty to this information. The trial resulted in a verdict of guilty, the jury fixing the punishment at five years' imprisonment in the state prison. Judgment was pronounced in conformity with the verdict. The appeal is from the judgment.

A motion for new trial was made, heard, and denied. No appeal was perfected from the order denying the motion for new trial. A bill of exceptions was settled containing all of the proceedings had at the trial, and also on the motion for new trial. It is here argued on behalf of the defendant that the evidence is insufficient to support the verdict. In view of these conditions some question arises as to the extent of our power to review the evidence.

This court in the case of *State* v. *Brantingham,* 66 Mont. 1, 212 Pac. 499, 501, after an exhaustive and elaborate review of the statutes and decisions, stated its conclusions as follows:

"Our conclusion is that upon appeal from the judgment alone we may consider the ruling upon defendant's motion so far only as it does not involve a matter of discretion, or, in other words, our review of the evidence may extend no further than to determine whether there is any substantial evidence to sustain the verdict." The conclusions there announced were followed in the case of *State* v. *Smart*, 81 Mont. 145, 262 Pac. 158.

The evidence in support of many of the material allegations of the information was wholly circumstantial in character. The defendant did not testify and offered no evidence aside from the testimony of one witness, whose evidence was only remotely material and created no conflict with the testimony of the witnesses in behalf of the state.

Where a criminal prosecution is dependent upon circumstantial evidence, a conviction cannot be sustained unless the criminatory circumstances point so clearly to defendant's guilt as to be inconsistent with any other rational hypothesis. (*State* v. *Ebel*, 92 Mont. 413, 15 Pac. (2d) 233; *State* v. *Hood*, 89 Mont. 432, 433, 298 Pac. 354; *State* v. *Woods*, 54 Mont. 193, 169 Pac. 39; *State* v. *Russell*, 93 Mont. 334, 18 Pac. (2d) 611.) Convictions may not be founded upon conjectures, however shrewd, nor upon probabilities, however strong (*State* v. *Lund*, 93 Mont. 169, 18 Pac. (2d) 603; *State* v. *Woolsey*, 80 Mont. 141, 259 Pac. 826; *State* v. *Taylor*, 51 Mont. 387, 153 Pac. 275; *State* v. *Riggs*, 61 Mont. 25, 201 Pac. 272); but only upon evidence which establishes the guilt of the defendant beyond a reasonable doubt, i. e., upon proof such as logically compels the conviction that the charge is true (*State* v. *Kerrigan*, 87 Mont. 396, 287 Pac. 942; *State* v. *Mullins*, 55 Mont. 95, 173 Pac. 788; *State* v. *Cooper*, 78 Mont. 35, 252 Pac. 376). All of the foregoing cases recognize the rule that if circumstantial evidence meets the tests announced in these decisions, it is sufficient to sustain a conviction.

Mrs. Arthur was the owner of an unbroken, grey, Appaluchian mare, having a roan or "reddish" or sorrel colored neck, in the summer of 1935. Some witnesses characterized these markings as being "odd" and referred to the red markings as being a "spot." Mrs. Arthur had owned the animal since it

was a colt. In the year 1935 the mare was around twelve years old, and bore the brand described in the information. This brand was the recorded brand of Mrs. Arthur. The mare, together with some other horses belonging to Mrs. Arthur, customarily ranged on East Tooley Creek, in Roosevelt county, some fifteen miles distant from the home of Mrs. Arthur and her husband, in the same county, near U. S. Highway No. 2. Mrs. Arthur rounded up her horses on this range in June, 1935, and found this mare among her horses there. During the winter of 1935–36, Mr. and Mrs. Arthur were absent from their home, returning in June of 1936. They rounded up their horses upon their return and found this particular mare missing. Mrs. Arthur testified that she never sold or disposed of the mare, and that she had never authorized any other person to sell or give away this mare, or any other of her horses. She said she last saw the mare on her usual range in August, 1935.

A neighbor, who was familiar with the mare, saw her in various years on her usual range, and last observed her there in the month of September, 1935. Experienced livestock men testified that range horses, such as this one, which have an accustomed range, would not stray away from it.

Mrs. Summers, who had known the defendant for thirty-eight years but had not seen him for that period of time, testified as to his coming to her home in Sheridan county about 7:30 one morning early in April, 1936. He appeared to be tired and cold, and after breakfast she observed him sleeping in his chair located near the heating stove in her home. He explained his appearance at the early hour of the morning by stating that he had corralled some horses. About 500 feet from the Summers house was a corral. Some small corrals were located at the residences of neighbors of Mrs. Summers. About 8 o'clock of this morning, the eighteen year old son of Mrs. Summers, Ernest by name, returned home after an absence since noon of the preceding day. His father and grown brother, Dave, were absent when he left and had not returned upon Ernest's arrival home. Ernest observed in the corral some ten head of horses which were not the property of any of the members of the Summers

family. About 11 o'clock on this morning young Summers and the defendant went to the corral. Louis Marsh and Johnny Akers were there, although these two men had previously called at the house. Ernest Summers related the occurrences at the corral in the forenoon of that day as follows: "When I got down to the corral with Wallette, Johnny Akers wanted Louie to buy these horses. Louie said he couldn't use them—they were too skinny, and he said they wouldn't stand the trip. Wallette told him the age of this horse and that one, and that is about all I heard him say. He pointed out the horses and told them their age and everything else; yes. I didn't hear him do any dickering at all with Marsh. I was present there and heard all the conversation that went on. They were in the corral there about three-quarters of an hour. I never seen any of the brands of these horses, and wouldn't know them if I did see them. I didn't look for any brands. I never at any time heard Wallette say anything to me about selling any of these horses— to nobody. Wallette really never tried to sell them. He showed what age they were, and how old they were. He was showing that to Louie Marsh. That is all I can say."

These four men had their noonday meal at the Summers home. The defendant, Akers, and Marsh thereafter engaged in conversation in another room in which Mrs. Summers was not present, and she said she heard none of the conversation. Afterward accompanied by young Summers, they returned to the corral where he heard no further conversation between them. Marsh then employed Summers to drive these horses to Plentywood; among them was a grey mare "with a reddish spot around her neck. In this mark around the neck there was red mixed in with the white." Summers estimated the age of the mare at twelve years; she appeared to be with foal. Summers alone drove the horses to Plentywood, where he delivered them into the railroad stockyards.

On April 6, 1936, Louis Marsh consigned a carload of twenty-two horses over the Great Northern Railway to the Wisconsin Dairy Cattle market at Janesville, Wisconsin. This carload of horses was inspected by Hans P. Madsen, livestock inspector.

He certified that the car contained one white mare branded **W 9** on the left hip, and that Marsh produced and delivered to him a bill of sale for this mare and other horses signed by Dave Summers, who was Mrs. Summers' elder son. Both she and Ernest inspected the signature on this bill of sale and testified that it was a forgery. Mrs. Summers said her son had a brand entirely different from the one described in the bill of sale, and that her son Dave had never owned any horses bearing this brand. It was testified on the trial that the whereabouts of Dave Summers was unknown at that time.

On April 10, 1936, a carload of twenty-two horses was received by one Marston at Janesville, Wisconsin, from Plentywood, shipped by Louis Marsh, containing a "dirty grey mare with a sprinkling of red hairs in the neck. Some people might call it a spot." Eight days later Marston sold this mare and her colt—a recent arrival—to Paul Wixom, who resided in the vicinity of Janesville.

On July 6, 1936, Walter Bridges, an experienced livestock man, Phil Buckley, state stock inspector, and Robert Grainger, a neighbor of the Arthurs and a livestock man, all inspected the mare then in the possession of Wixom in Wisconsin. Grainger who had observed the mare numerous times on her range in Montana and knew her then as belonging to the Arthurs, identified the mare in Wisconsin to be the same mare he had seen in Montana, as the property of Mrs. Arthur. The description of the mare observed in Wisconsin, her markings and brand, were testified to by the other two witnesses as corresponding with the description of the mare given by Grainger and other witnesses on the trial.

Applying the foregoing rules of law to this evidence, the question arises: Is there any evidence in the record to support the verdict? The evidence was ample to prove that the mare, the property of Mrs. Arthur, was stolen and shipped to Wisconsin. The only reasonable conclusion from the evidence is that this mare was among the horses driven from the Summers corral to Plentywood. Thus the question is narrowed to whether the

defendant was the one who stole the mare. He admitted he had corralled horses at the Summers home the morning in question. Horses were in the Summers corral. They did not belong to any of the members of the family. When Akers and Marsh went to the corral, the defendant spent considerable time in pointing out to Marsh the various horses and their ages. Akers was urging Marsh to buy them. Akers, Marsh, and defendant, after observing the horses in the Summers corral, had a conversation in a separate room which was not overheard, after which they adjourned to the corral. Marsh there employed Summers to drive these horses to Plentywood, among them the mare in question. Neither the defendant, Akers, nor Marsh offered any explanation of their conduct on that occasion. The only logical conclusion from these facts and circumstances, as well as the other facts proven on the trial, is that Wallette corralled the horses and sold them to Marsh. Hence we are unable to say that there is no substantial evidence to support the verdict.

Judgment affirmed.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES STEWART, MORRIS and ANGSTMAN concur.

Rehearing denied January 21, 1938.