STATE, RESPONDENT, *v.* KINGHORN, APPELLANT.

(No. 7,945.)

(Submitted June 22, 1939.   Decided July 12, 1939.)

[93 Pac. (2d) 964.]

*Mr. Raymond Shelden* and *Mr. Harry P. Atwater,* the latter of the Bar of Sturgis, South Dakota, for appellant, submitted an original and a reply brief and argued the cause orally.

26

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Carl N. Thompson,* Assistant Attorney General, and *Mr. Gordon O. Berg,* County Attorney of Carter County, for the State, submitted a brief; *Mr. Berg* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

Russell Kinghorn and two others were charged with the commission of burglary of a homestead cabin in Carter county. Kinghorn demanded a separate trial and it was granted. He was convicted and sentenced to two years in the penitentiary, and from that judgment of conviction he has appealed. His co-defendants remain still to be tried.

Assignments of error are specified in twenty-two particulars, which in their aggregate embody the three following questions: (1) Is the evidence sufficient to support the judgment? (2) Did the court err in refusing certain requested instructions? (3) Was Esther Johnston, state's witness, properly impeached?

The record discloses the following circumstantial evidence upon which the conviction must stand or fall, there being no eye-witnesses to the crime. The information charged the crime to have been committed on or about April 27, 1937. Defendant had previously operated a hotel in the town of Alzada, approximately 23½ miles from the burglarized cabin, which hotel was destroyed by fire about April 1, 1937. He spent the next few months around Alzada, his father's ranch across the border in South Dakota, and was engaged a short time at construction work around Fort Peck. After this he purchased the T. C. Lunchcounter at Sturgis, South Dakota.

The prosecuting witness, Mrs. Bruce Miller, visited her cabin in March, 1937, and at that time the cabin was intact and her property undisturbed. In June, the same year, at the time of her next trip to the cabin, she discovered the lock on her door had been broken and many of her possessions had been taken. She notified the authorities and submitted a list of the missing articles. In January the following year she accompanied the Carter county officers to Sturgis, South Dakota, and upon the complaint and affidavit of the deputy sheriff a search warrant was obtained granting authority to enter and search a residence occupied by defendant and a lunchroom operated by him. As a result of the search, a large number of the missing articles were found. Chinaware, wall lamp, ice box, dishes, pillows, mirror and numerous other articles were found at the residence, and cooking utensils were found at the lunchroom. In the basement under the lunchroom, where defendant stored his vegetables, a cedar chest and medicine cabinet belonging to Mrs. Miller were found, the former partially concealed by a "tarp," and the latter in a sack. These were removed to the sheriff's office, and before the chest was opened, defendant denied having ever seen it. It was opened in defendant's presence. He denied having a key for the cedar chest at that time, necessitating a forced opening, but at the trial admitted having possession of the key. Many of the articles in the chest were positively identified and claimed by the prosecuting witness. Two shirts were claimed by defendant, and a number of other things were not claimed

by anyone present. Among other things in the chest were two account books of defendant—one pertaining to the lunch business at Sturgis, and the other to the hotel business at Alzada. Upon being questioned as to the account books, defendant made a statement to the effect that "he was on the spot, but he was not alone." He refused to make any explanation of his possession of the stolen property until he had consulted an attorney.

The record also shows that some attempt was made by defendant to settle the matter with Mrs. Miller out of court previous to trial. Defendant admitted he attempted to talk to her, but denied he offered her anything other than that she would "be sure to get her property if there was no appearance in court." To the contrary, however, was the testimony of the Carter county sheriff, who testified that while defendant was being held in jail at Sturgis pending extradition, he inquired whether Mrs. Miller was still in town, and said he would like to see her, and that he would pay $200 or $300 to clear the matter up.

On behalf of defendant evidence was introduced to show that he was not in Montana on the date of the burglary charged, and that he innocently came into the possession of the stolen property through two strangers who left the cedar chest and contents as a pledge against two meal tickets issued by an employee of the lunchroom operated by defendant. Defendant testified that he refused to accept the chest, but upon arriving at his residence found that one of his female employees, who resided there also, had accepted it because she wanted the cedar chest. In contradiction of this explanation Mrs. Miller and her husband testified to a conversation had between them and defendant at the ranch of her father, wherein defendant in explanation of the stolen property said, "I bought the stuff for $25 from a man who has left the country." Defendant denied having made this statement.

Is the evidence sufficient to support the judgment of conviction? It is obvious from the synopsis set out that the strongest circumstance pointing toward the guilt of defendant is the undisputed fact that part of the stolen property was found in his possession ten months after it was known that it had been stolen.

The rule with regard to possession of stolen property is stated in 9 American Jurisprudence, section 74 et seq., page 276, as follows: ''Mere proof of possession of property recently stolen during the commission of a burglary does not raise a presumption of guilt as a matter of law. In some jurisdictions it is regarded as presumptive of prima facie evidence of guilt; in others, it is not. Some courts have taken the view that where the property found in the defendant's possession is identified by the prosecuting witness as his goods, and his testimony is not contradicted, there is sufficient evidence to enable the jury to determine whether or not the goods found in the possession of the defendant were in fact the goods stolen from the prosecuting witness, and some courts have regarded such proof as sufficient to sustain a conviction. Other courts take the opposite view.

''The strength of the inference or, in other words, the weight which is to be attached to such evidence is strong or weak according to the character of the property, the nature of the possession, its proximity to the time of the theft, the place of its possession, and the secrecy and the exclusiveness of the possession.

''Ordinarily, of course, the mere possession of the stolen property is not the only incriminating fact. The possession of stolen property is frequently accompanied by incriminating circumstances, such as the character of the explanation of the possession, the secrecy of the possession, a denial of the possession, the presence of the accused near the scene of the crime, his flight, etc.; and it is generally held that proof of such possession explained falsely, or not reasonably, or accompanied by other guilty circumstances is sufficient to carry the case to the jury and to support a conviction.'' (See, also, 12 C. J. S., sec. 50, page 722.)

This rule has been consistently applied and followed in this state in larceny and robbery cases, and finds expression in the following language in State v. Russell, 93 Mont. 334, 18 Pac. (2d) 611: ''It has been held by this court, following the rule recognized everywhere, that mere possession of property recently stolen is not alone sufficient to convict the possessor of the larceny of it, although it is a strong circumstance indicating guilt.

When, however, such fact is supplemented by other facts inconsistent with the idea that the possession is honest, such as the giving of a false or improbable explanation of it, or a failure to explain, where a larceny of the property is charged a case is made sufficient to submit to the jury.'' (See, also, *Territory* v. *Doyle*, 7 Mont. 245, 14 Pac. 671; *State* v. *Sullivan*, 9 Mont. 174, 22 Pac. 1088; *State* v. *Wells*, 33 Mont. 291, 83 Pac. 476; *State* v. *Willette*, 46 Mont. 326, 127 Pac. 1013.)

In *State* v. *Sparks*, 40 Mont. 82, 105 Pac. 87, 135 Am. St. Rep. 608, 19 Ann. Cas. 1279, the rule was applied to a burglary case and it was there said, after reciting the rule announced above: ''So, where the charge is burglary, if property taken from the owner is soon thereafter found in possession of the person charged with the felonious entry, proof of this fact, together with circumstances showing guilty conduct, is presumptive evidence, not only of the larceny, but also that he made use of the means by which the property was acquired.'' (Citing authorities.)

Having in mind the fact as recognized in *State* v. *Ebel*, 92 Mont. 413, 15 Pac. (2d) 233, also a burglary case, that ''proof of possession of recently stolen property is less effective in a burglary case than on a charge of larceny, for, even absolute proof of a larceny, without proof of entry with the intent, at the time of entry, to commit larceny, is insufficient to prove burglary (citing *State* v. *Green*, 15 Mont. 424, 39 Pac. 322),'' we are of the opinion that in view of the circumstances of this case, and particularly the conduct of defendant on the day of the fruitful search of his premises and subsequent thereto, there was sufficient evidence upon which the jury could base its verdict of guilty.

Counsel for defendant urgently contend that defendant's possession was too remote in point of time from the date the burglary was discovered, and advance the theory that ''the strength of the inference of guilt against the accused decreases in proportion to the length of elapsing time from the date of the burglary to time of finding the stolen property in possession of the accused.'' As an abstract proposition this may be true, but from an examination of the authorities generally on the subject,

we are convinced that each case must rest largely upon the circumstances surrounding and leading up to the possession and the accused's conduct with relation thereto. What in one instance might constitute remoteness of possession to the extent that it would be immaterial matter, under a different set of circumstances would not be remote at all, and the trial court in its discretion could admit or exclude evidence with relation thereto. As stated in 9 American Jurisprudence, section 64, page 272:

"It is always competent, as bearing on the question of the defendant's guilt, to show that property stolen from the premises laid in the indictment was recently in the possession of the defendant or of some third person who is shown to have been concerned in the burglary, or who could have obtained possession of it only from the defendant, provided the burglarious entry has been proved, the goods are identified with reasonable certainty, and the burglary and the larceny are shown to have been parts of the same transaction. When this proof has been made, the defendant has the corresponding right to explain such possession in order to rebut the unfavorable inference arising therefrom. In explaining his possession, however, he is not required to show that he acquired the possession honestly; it is sufficient if he shows that the property came into his custody in any way other than by burglary." The formidable array of cases in the footnote to this section supports the text. (See, also, *McNeely* v. *State*, 106 Tex. Cr. 605, 294 S. W. 566, *Myers* v. *Commonwealth*, 132 Va. 746, 111 S. E. 463, and 6 Cyc. p. 246.)

Here there is no question but what the cabin was burglarized by someone, and, therefore, the state established the *corpus delicti*. The property found was conclusively identified as that taken from the cabin, and consequently, in view of all the circumstances, the jury was justified in inferring that defendant was the one who proceeded burglariously to obtain possession of the property. Defendant's explanation of the manner in which he came into possession of the property apparently did not satisfy or convince the jury that such possession was by any other means than the burglary. As stated in *State* v. *Sparks*, supra: "Burglary is one degree removed from larceny; but,

when the facts proven warrant the finding of the larceny, and the surrounding circumstances are such as to show that the larceny could not have been committed without the felonious intent, the evidence is sufficient to warrant the finding of the burglary also.''

The circumstances surrounding defendant's possession of the stolen property were most incriminating. Prior to the opening of the chest he denied ever having seen it before, but when confronted with the damning evidence of some of his own possessions found therein, admitted he was ''on the spot.'' He denied having a key for the cedar chest, but at the trial admitted he had it and produced it; upon being informed of the purpose of the search of his premises, he went willingly along and on discovery of the various items and positive identification thereof, chose not to speak or avail himself of the opportunity to make a complete explanation of his possession until such time as he could see a lawyer; the credibility of the explanation ultimately given in court was dissipated by reason of previous inconsistent statements made, namely: He first denied having ever seen the property before; secondly, he told Mrs. Miller he had bought it from a stranger for $25; and, finally, on the witness stand produced two partly punched meal tickets and asserted under oath that the cedar chest and contents had been received from two strangers as a pledge in lieu of payment for the tickets, and the chest to be redeemed later. Noticeably absent from the witness stand, however, was the employee who, as testified to by defendant, received the chest at their mutual residence. If in truth such was the fact concerning acquisition of the chest, she could have corroborated defendant in his story. Defendant's attempts to make a settlement with the prosecuting witness prior to trial, whether for a consideration in money or otherwise, belied also the clear conscience of an innocent man. Lastly, the dominion exercised over the stolen property betrayed guilt. Common experience teaches that a cedar chest, an article of furniture desired in this instance by defendant's employee and accepted from the reputed strangers because she wanted it, would not under

ordinary circumstances be placed in a dirt-floor basement with the vegetables, more especially so where it was known by defendant that it contained bed linen, luncheon sets and other currently useful and valuable articles. It was so found, concealed partially at least by a "tarp," with its companion, the stolen medicine cabinet, by its side, obscured from view by a gunny sack. This possession was shown by the record to be exclusive, although defendant and his witnesses attempted to show that others had access to the basement, and was too clandestine for that which would normally surround honest ownership of such type of property. Under these circumstances we can readily understand how the jury was able to agree with defendant, as it must have done, that he was "on the spot," as he said he was. Whether he was "alone" or not remains to be seen.

Without reiterating the requested instructions which were refused by the trial court, we deem it sufficient to say that after a careful study of the record in the light of all the instructions given, defendant's rights were amply protected and in no way prejudiced by the failure to give the requested instructions. The law applicable to the facts was comprehensively covered by the instructions as a whole. For the main part, the substance of those refused was covered by other instructions, and under such circumstances it would be to sacrifice substance for form in the interest of technicality—a fast-fading theory in modern criminal procedure—to reverse the judgment merely because the verbatim instructions were refused. (*State* v. *Kennedy,* 82 Mont. 165, 266 Pac. 386; *State* v. *Stevens,* 104 Mont. 189, 65 Pac. (2d) 612; *State* v. *Keckonen,* 107 Mont. 253, 84 Pac. (2d) 341; *State* v. *Espelin,* 106 Mont. 231; 76 Pac. (2d) 629.)

The final question involves the impeachment by the state of one of its own witnesses. The county attorney evidently expected to elicit from the witness the fact that defendant and the two co-defendants left Alzada together in a car the night of the alleged burglary, proceeded in the direction of the cabin later found burglarized, and arrived back in Alzada about 2 o'clock the next morning. The witness testified to the contrary however, that she in company with two others left Alzada

for Fort Peck the morning of the 27th of April, and denied that it was the 28th. By so testifying she placed the prosecution in the apparently embarrassing position of having no witness by whose testimony it could place defendant within the vicinity of the burglarized cabin on the night of the crime charged. After a few questions and answers had been put and given, the county attorney evinced surprise and asked leave to put the witness under the rule that he might proceed by way of cross-examination to show prior inconsistent statements because she was not giving the testimony reasonably to be expected by the prosecution. He stated, also, that the witness had become hostile, and that even prior to trial she had refused to confer with him relative to the case. Upon this showing made, the court granted the prosecution permission to cross-examine for the purpose of impeachment, which it did by proving by others that she had previously made statements which on the witness stand she denied having made.

The practice of impeaching one's witness is an innovation upon the common-law rule which did not permit such practice. In this and many other states, the right is expressly recognized by statute. Section 10666, Revised Codes, provides: "The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony as provided in section 10669." And section 10669 provides: "A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them."

These statutes come to us from the California Code of Civil Procedure, at which time they had been construed by the highest courts of that state. This being so, we were presumed to

have accepted them subject to that construction. (*Esterly* v. *Broadway Garage Co.*, 87 Mont. 64, 285 Pac. 172.) While the sections have been subject to construction by this court on previous occasions (*State* v. *Bloor*, 20 Mont. 574, 52 Pac. 611; *State* v. *Willette*, supra; *State* v. *Hurst*, 23 Mont. 484, 59 Pac. 911; *Wingate* v. *Davis*, 77 Mont. 572, 252 Pac. 307), still the limitations placed upon the application of the statutes by the California courts prior to our adoption of them, have not all been expressly passed upon. These limitations are that it is not permissible for a party to interrogate his own witness concerning previous inconsistent statements where the witness merely fails to testify to a material fact as expected, but it is necessary in order to authorize such examination, in addition to showing surprise, that the witness shall have given testimony hurtful to the party calling him. (*State* v. *Richardson*, 63 Mont. 322, 209 Pac. 124; 27 Cal. Jur., sec. 144 et seq., p. 172, and cases cited in support thereof. See, also, *State* v. *Wolfe*, 109 W. Va. 590, 156 S. E. 56, 74 A. L. R. 1039, particularly at page 1064; and *Young* v. *United States*, 97 Fed. (2d) 200, 117 A. L. R. 316.)

Applying such limitations to the instant case, let us first examine the element of surprise claimed by the county attorney. It is urged by counsel for defendant that surprise was not sufficiently shown to justify impeachment of the witness, nor facts elicited to indicate that the witness was in fact hostile. As noted above, the county attorney claimed surprise and the hostility of the witness. Defendant's counsel take the position that, from the statement made by the county attorney, the prosecution could not have been very much surprised by the witness who had previously refused to confer with him, that it knew in advance that she would refuse to testify as desired. A similar contention was made in *State* v. *Clark*, 87 Mont. 416, 288 Pac. 186. The court there said: ''We do not observe any such limitation in the statute. Moreover, if the element of surprise be deemed material, we think it need not be confined to what develops after the witness takes the stand. No such narrow construction of the statute is permissible. The purpose of the statute is to elicit the truth. This, like many other phases of trial practice must

be reposed in the sound discretion of the court. * * * It was clear to the court that the witness was making statements different from prior statements made by him to the officers when the case was under investigation; that he was unfriendly to the state; that he was attempting to protect the defendant with whom he was friendly.'' Such apparently was the showing made to the court in this case, and, therefore, what was said in the case just quoted from applies with like force and effect here.

As to whether the testimony given was prejudicial to the state and in favor of defendant, a close question is presented. As we have demonstrated from the evidence, the matter of the date of the alleged ride taken by defendant and his two co-defendants, which fact the prosecution showed was in contradiction, was, in view of the other evidence and circumstances of the case, not necessary to prove the state's charge of burglary. It was a fact, however which, if properly shown, would no doubt have strengthened its case. On the other hand, since one of the defenses offered by defendant was an alibi, to the effect that he was not in the state on April 27, certainly the statement made by the witness would tend to corroborate such alibi, and therefore be prejudicial to the state to that extent, and at the same time mitigate in defendant's favor in a material matter. This being the case, we are of the opinion that the answer made by the witness was of such a prejudicial nature as against the state as to justify its belief that the witness had turned hostile and to justify impeachment.

The cross-examination that followed was quite extensive and, perhaps, certain matters inquired into were not material to the burglary charge. Many negative and ''I don't remember'' answers were given. Likewise, intimations reflecting on the doubtful character of the witness were drawn to the jury's attention contrary to the provisions of the statutes permitting the impeachment and the legitimate grounds of the privilege exceeded. However, in view of the purpose of the impeachment, and the fact that there was sufficient evidence to sustain the charge in the information without this particular witness' testimony, we

are not disposed to hold that error was committed of such prejudice as to justify the return of this case for a new trial.

Theoretically, impeachment is only intended to neutralize the effect of the apparent change of testimony offered by the witness in question. It is not intended that the testimony be admitted for the purpose of supplying what the witness was expected to, but did not, say as a basis for a verdict, but only to eliminate from the jurors' minds any positive adverse effect which might have been created by the testimony which surprised the offerer. When the prejudice caused by the surprising testimony has been neutralized and removed, the legitimate purpose of allowing the impeachment has been accomplished, and there should end the impeachment in order that the issues may not be unnecessarily or illegally complicated for the jury. (*Young* v. *United States,* supra.)

The correct analysis, in our opinion, of the purpose of the impeachment of a party's own witness, and the extent to which the evidence so adduced may be considered by the court and jury is found in *State* v. *D'Adame,* 84 N. J. L. 386, 86 Atl. 414, Ann. Cas. 1914B, 1109. It has particular applicability for the reason that there was sufficient other evidence in the record to sustain the conviction. We quote it at length for the guidance of the bar on the subject, to the end that the boundaries of impeachment may be clearly defined and the privilege not infringed upon or transcended in the future:

"Under this view, when, to the 'surprise' of the state, Knight impliedly testified (by failing to identify him) that defendant was not the guilty party, the state had the right to neutralize or 'discredit' this evidence by showing by other witnesses a contradictory statement by Knight on a previous occasion. This was not to prove the truth of such contradictory statement, but to neutralize or withdraw the effect of the unexpected testimony. Professor Wigmore says: 'Since, in the words of Chief Baron Gilbert, it is 'the repugnancy of his evidence' that discredits him, obviously the prior self-contradiction is not used assertively; i. e., we are not asked to believe his prior statement as testimony, and we do not have to choose between the two (as we do choose in

the case of ordinary contradictions by other witnesses). We simply set the two against each other, perceive that both cannot be correct, and immediately conclude that he has erred in one or the other, but without determining which one. It is the repugnancy and inconsistency that demonstrate his error, and not the superior credibility of the prior statements. Thus we do not, in any sense, accept his former statements as replacing his present one; the one merely neutralizes the other as a trustworthy one. In short, *the prior statement is not hearsay,* because it is not used assertively, i. e., not testimonially. The hearsay rule simply forbids the use of extrajudicial utterances as credible testimonial assertions; the prior contradiction is not used as a testimonial assertion to be relied upon. It follows, therefore, that the use of prior self-contradictions to discredit is not obnoxious to the hearsay rule.' (Wigmore, Evidence, sec. 1018.)

"It may be urged that the effect of this doctrine might be that a party, desiring to prove something which was not in fact true, might call a witness to swear it was not true, and then, by calling other witnesses to testify that on a previous occasion, when not under oath and not subject to cross-examination, the first witness had made a contrary statement, produce the effect of substantive proof of the untruthful fact desired, wthout in reality having had any one testify to it. This, however, is not the case. As was stated by Wigmore in the same section: 'It follows, conversely, that prior self-contradictions, when admitted, are not to be treated as assertions having any *substantive or independent testimonial value;* they are to be employed merely as involving a repugnancy or inconsistency; otherwise they would in truth be obnoxious to the hearsay rule.' (Wigmore, Evidence, sec. 1018, and cases there cited.) * * * They [the jury] may permit it to wipe the slate clean, but they must not permit it to substitute any other writing for that which it expunges. In a case barren of other direct proof of the facts which such contradictory statements would tend to prove, if admissible for that purpose, the absence of such instructions, even when not requested might be sufficiently injurious to war-

rant reversal; but in the present case there was ample other evidence from which the jury could find that the defendant was, in fact, the man who bought the stolen goods. We conclude, therefore, that the effect of the testimony in question was only to neutralize the substantive, contrary, testimonial result of Knight's failure to identify the defendant, and for that purpose it was admissible." (See, also, *State* v. *Guida,* 118 N. J. L. 289, 192 Alt. 445.)

For the foregoing reasons we hold that the evidence, exclusive of that of the impeached witness, was sufficient to justify the verdict and judgment of conviction, and that assigned errors, if any error there was, were not prejudicial to defendant's rights or such as to prevent him from having a fair trial. All of the matters of defense were submitted to the jury under proper instructions. The explanations of defendant and his witnesses apparently were not convincing. The jury saw the witnesses, observed their demeanor upon the stand, heard the evidence, and considered it in the light of the instructions. It was its province to judge of the truth, weight and sufficiency of the asserted defenses. The jury believed the evidence against defendant, and, therefore, we have naught to do but affirm the judgment.

Counsel for defendant were most diligent and thorough throughout the trial in their efforts to preserve all of defendant's rights, and on appeal have presented us with an unusually comprehensive brief on all points raised.

Judgment affirmed.

Mr. Chief Justice Johnson and Associate Justices Morris and Erickson concur.

Mr. Justice Angstman:

I dissent. I think my associates are in error in holding that there was sufficient evidence, aside from the contradictory statements of the state's impeached witness, to sustain the conviction. Aside from the statement of that witness, which statement my associates properly hold cannot be resorted to, there

is not any evidence, direct or circumstantial, which shows or tends to show, that defendant was ever at the scene of the burglary at any time. There were no tracks, no footprints nor other circumstances tending to connect defendant with the burglary.

The only evidence relied upon is defendant's possession of the property and evidence of contradictory statements made by him in explanation thereof. Doubtless such evidence would be sufficient to sustain a conviction for the crime of receiving stolen property, knowing it to have been stolen. But the fact that defendant may be guilty of some crime is no justification or excuse for sustaining a conviction for the crime of burglary regardless of how it was obtained. What is thought to be a desirable end is not a substitute for lawful means.

Here the charge is burglary. The gist of the offense is the breaking and entering of a building with the intent to commit larceny. There is nothing in the record except suspicion that defendant was guilty of that offense. We have often held that a conviction cannot be founded upon conjecture, however shrewd, nor upon probabilities, however strong. (*State* v. *Postal Tel. Cable Co.,* 53 Mont. 104, 161 Pac. 953; *State* v. *Taylor,* 51 Mont. 387, 153 Pac. 275; *State* v. *Duncan,* 40 Mont. 531, 107 Pac. 510; *State* v. *Schrack,* 60 Mont. 70, 198 Pac. 137.) Opportunity to commit the crime is not sufficient upon which to base a conviction. (*State* v. *Jones,* 95 Mont. 317, 26 Pac. (2d) 341; *State* v. *Keckonen,* 107 Mont. 253, 84 Pac. (2d) 341.) Where circumstantial evidence alone is relied upon, the circumstances must point so clearly to the guilt of the accused as to preclude every other reasonable hypothesis. (*State* v. *Wallette,* 106 Mont. 15, 75 Pac. (2d) 799, and cases therein cited.)

If this conviction can be sustained on the record before us, then the foregoing declarations of this court mean nothing. Were we to extend the rule applied in the majority opinion to the trial of civil cases as to circumstantial evidence, there would indeed be a revolutionary change in the trial of such cases.

I think the judgment should be reversed and the cause remanded for a new trial.

Rehearing denied September 26, 1939, MR. JUSTICE ANGSTMAN dissenting.